First case for argument this morning, September 21st, 2018, are case numbers 18-004 and 18-6005 N. Ray Barbara A. Wigley, Lariat Companies, Inc. v. Barbara A. Wigley. Mr. Anderson? We could nickname this case Lariat 4 or Lariat 5, I'm not sure which one. Well I was going to start by saying welcome back. Yes, thank you very much. With me, by the way, today at the council table is my co-counsel, George Warner. I will be presenting the argument. As indicated, I'm Kurt Anderson. I represent the appellant, Lariat, and this is a cross-appeal and appeal from an order of the Bankruptcy Court. First of all, both cases, determining the amount of a claim, an allowed unsecured claim in the bankruptcy case. The issue that we're presenting is one of first impression, which is whether the landlord limitation under 502b6, if I can use a shorthand term, applies or protects the estate or the person of a fraudulent transferee. The other issue is various issues raised by Barbara Wigley that I'll address further. Obviously we're here to argue that there is no such claim limitation in the case of a fraudulent transferee and that the court just correctly rejected the arguments that Mrs. Wigley raised. Before I go into that though, there are three side points that may interest the court. First of all, our claim references a Minnesota state court judgment that is still under appeal. Briefing is pending in that case. What the effect of reversal or modification may have remains to be seen. Is that the judgment on the lease termination? No, that is the judgment on the fraudulent transfer. That's the move to action. Excuse me? That is the move to action. Yes, yes, that's correct. That's correct. And are you still pursuing that appeal as to Mr. Wigley or is it now just Mrs. Wigley? Just Mrs. Wigley. Mr. Wigley was discharged. He joined in the post-trial motions but not in the appeal. A couple other incidental points. The same claim as of this week now has been accepted from discharge. So regardless of how this turns out in terms of . . . Accepted from discharge in which case? By Judge Fischer in the bankruptcy case. But in Mr. or Mrs. Wigley? Mrs. Mr. Wigley's case has been wrapped up and . . . So Mrs. Wigley has a non-dischargeability judgment against her? Right, under the Husky Doctrine. The court determined . . . For what? For the entire pre-petition claim. That is a matter of record. The court can reference it. For $2.3 million? No, it would be the amount of the fraudulent transfer which was . . . All right, so when you talk about the state court claims, we need to make a distinction between the lease amount and the MUFTA amount. Right, right. Okay, so the entire MUFTA amount is non-dischargeable as to Mrs. Wigley. That's correct. The court determined she was an actual culpable participant in that transfer. So are you asking that the cap be applied . . . I mean, are they asking for the cap to be applied to this non-dischargeable action? Or what's the cap being applied to? Well, there's an interesting interaction going on here because there are two issues. Number one is what will Mrs. Wigley owe notwithstanding her whole bankruptcy case? That's the 523. The second issue is what her estate needs to pay as a part of her confirmed plan. So, hypothetically speaking, she could pay the $308,000 that she's already paid, deduct that from her non-dischargeable liability, and still come out owing. It doesn't moot out the issue, however, for us, because obviously we'd like to get paid under her plan as much as possible by maximizing our claim in the bankruptcy case. I don't want to keep you off track from getting to the meat of your argument yet, but I'm curious about the non-dischargeability. Was the amount of the claim determined in that, or was it just that whatever the amount of the claim is ultimately determined to be will be non-dischargeable? It's two days old. The opposing counsel is nodding his head, so I know what his position is going to be. It's two days old, and we do have published findings. I don't think that Judge Fischer put a number on it, but I think in general the parties would assume that that's the full amount of the state court judgment with accruing interest. And if he puts the amount on it, Mrs. Wigley's going to appeal from that judgment as well, because we'll have the same issue regarding the allowed amount. There may be a Wigley 6. We don't know at this point. But perhaps at this point it'll reframe the settlement discussion. From a legal standpoint, can we consider this issue of the non-dischargeability judgment in reaching a decision on this particular case? Well, that's why I brought it to your attention. My view is that no, you would not. You would simply decide this issue as it's been presented to you, because it makes a difference. If you give us the higher claim, we're going to get paid pursuant to a plan, and we're not going to have to chase this defendant through a state court collection process, except for perhaps a much smaller amount. So it makes a practical dollar difference to us. Well, the dischargeability issue is significant to your client. Let's go to 506. Sure, yes. 502B6. I just wanted to make sure the court was advised. First of all, I don't think I'm going to belabor the facts in this case. The court's been over them many times. Suffice it to say, there was originally the lease, the $2.3 million judgment that you referenced. You can jump ahead. Discharged and paid in part in the Michael Wigley case. Mrs. Wigley was held liable for a fraudulent transfer. That's what this is all about, in the original amount of $788,000, which by the time she filed her case had amounted to over $1 million with interest. The issue is, I think in Judge Fisher's language, the issue can be gleaned from that language. He uses the phrase, ultimately resulted from. The statute says that we're claim limited if our claim resulted from. He four times in his opinion changes those words to say arising from, which implies a more attenuated causation, and also ultimately resulting from. The question is, you put it right before the court, matter of first impression. I can't give you any binding authority on it. Is this a situation where remote derivation invokes 502b6, or do we really talk about proximate cause? I've searched and presented the court with authority on that point. Virtually every time a federal court, to my knowledge, has been confronted with the phrase resulting from, it has translated that to mean proximate cause. In this case, the least termination, as this court noted in Wigley 1, the least termination happened in July 2010. At that point, Mrs. Wigley had absolutely no liability or any prospect of liability. But you could only bring the move to action against her because of the least termination claim. Isn't that correct? It's a predicate. It's correct. On the other hand, does that satisfy the phrase resulting from, or doesn't it? Ten months later, ten months later, or excuse me, seven and nine months later, she receives fraudulent transfers, determined to be actually fraudulent. Lariat accrues a claim and ultimately wins litigation and gets the million dollars that were, excuse me, 788 principal plus interest, million dollars in round numbers that we're talking about today. The Judge Fisher, you know, presented the first time, struggled with the question of is this, does the landlord limitation apply in this circumstance? Aren't there two issues under 502b6? Issue one, does the move to judgment from the state court relate back to the least termination? And two, should the formula, I call 502b6 a formula, apply to a non-lessee, a non-guarantor of a lessee? Well, the second one is what I came here principally to argue, and I think that would be dispositive if the court saw it Lariat's way. But as to that first position, my difficulty with that whole issue is that it simply doesn't arise from the statutory language. Statutory language simply says resulting from the termination of a lease. So what does, the real key phrase, the one to focus in on is resulting from. Now granted, with respect to Mrs. Wigley, we are neither a lessor, she's not a lessee, there's been no privity of contract. I think the causation, the resulting from causation, which is a narrow, much narrower than arising from or derived from or ultimately resulting from, has to be looked at temporally. Can you explain? Yeah. I was going to say, okay, it's generally accepted, I believe, that a guarantor is going to have, is going to be subject to the case. Absolutely, no question. So the guarantor's obligation arises from a guarantee. Correct. Okay. So why is that any less tenuous? The statute doesn't say guarantor, it doesn't say lessee, it just says resulting from the termination of a lease. So if I'm understanding your argument correctly, it shouldn't apply to guarantors either because their obligations arise from the guarantee, not from the lease. Well, let me address that because I think there is a distinction and a very important one to be made here. First of all, a guarantor is a, I don't plan on a lot of rebuttal anyway, a guarantor is a contractual obligee under a lease. The lease and the guarantee are part of the same transaction. Well, they may be part of the same transaction, but they're not the same document ordinarily. There's a separate document guarantee, correct? Well, usually they cross each other, but yes, and there's privity of contract. And perhaps most importantly, there is a contingent obligation that arises the minute those documents are signed. And concomitantly, for the same reason, there is a liability that arises the minute the default happens. Unlike a fraudulent transferee, that liability arises when the transfer happens. Well, I guess I understand this concept of the lease and who's liable under it. The question I really have is whether or not this MUFTA judgment is really an enforcement or collection mechanism, not liability under the lease. Well, it is an enforcement and collection mechanism. So does it constitute damages under the statute then? I mean, we've already held that it's not a separate cause of action, and the statute says that allow the claim of a lessor for damages resulting from the termination of a lease. Correct. And the question is, is this damages or some other form of compensation? But you just said it's an enforcement collection. Well, it's one of the mechanisms that a creditor has to prevent a debtor from evading. Now, whether we call it damages or simply give it back is... Did Mr. Wigley give it back in his case? No. He was allowed the full benefit of the landlord limitation. Whatever liability he had for that, first of all, he doesn't have to give it back. He gave it away in the first place. He would have to take it back rather than give it back. He's the transferor. But also, whatever his liability would have been under the $2.3 million, the FT, the fraudulent transfer liability, would have been overlapping. So, basically, that was treated as one complete... And as this court wrote in Wigley 1, basically, as to Mr. Wigley, it's the same debt. Overlapping rationales for the debt, but the same debt. Not true with Mrs. Wigley. Here's where we get that classic phrase used by the Seventh Circuit in the Cantrell case. It's a new debt. She incurred a new debt when she received a fraudulent transfer, as it turns out, a culpable fraudulent transfer. But in any event, I see my time is wrapping up. My one concern about... I have a hard time following the argument that Mrs. Wigley is making on her cross-appeal, other than to say that it appears that she has shifted her position. She's quoting a memo line on a check that doesn't exist. And for the first time, this paid-in-full thing in the check, misquoted, is the whole basis for her appeal. I think the judge correctly allocated or didn't allocate Michael Wigley's payment as some kind of credit against Mrs. Wigley's liability. I have a minute 20 left. I think I'll reserve that and hear what Mr. Lamey has to say. Thank you. Thank you. Thank you. Mr. Lamey. Thank you, Your Honors. May it please the Court, I represent Mrs. Wigley, and I'd like to first discuss the 506B6 cap issue. Can I interrupt just a minute? Yes. It may allocate your time a little bit differently. Was the accordant satisfaction argument raised before the bankruptcy court? I believe it was. There's a summary judgment motion, and I believe we raised that. I had co-counsel on that, so I almost certainly believe it was, Your Honor. Is the accordant satisfaction argument different than the claims already been paid in full? That's a distinction that I'm not sure there's a difference, but accordant satisfaction has different elements, and I read the brief to just say we think the claim's been paid in full. Right. I agree with you, Your Honor. I believe it makes no material distinction in our argument. We feel the claim has already been paid. Can you explain why the judge did not address the accordant satisfaction argument then, if it was raised before him? I believe he stated that he feels that there should be something owed here. He's not going to rule that there's a zero claim. He feels that there should be some amount owed. Why does he feel that way? I don't know, Your Honor. These were just comments made at summary judgment. Well, here's my concern. I reviewed the opinion. I don't see the words accordant satisfaction anywhere in it. So in his opinion, at least, it does not appear to me that he addressed the issue. I guess my question to you is, was that an oversight on his part because you believe that you raised the issue of accordant satisfaction in front of him and he did not address it? Or was it not raised? Or was it not raised? I believe it was raised, Your Honor, and I believe there's an applicability of the payment issue that wasn't addressed either, meaning does the payment from Michael Wigley's case have any applicability towards the claim in Mrs. Wigley's case? Well, wasn't that the stipulated amount? There were three stipulated amounts. Wasn't one of those amounts if the payment was credited against the proof of claim? Yes, you're right. Yeah, we stipulated the three different scenarios that could result from the claim objection. And if I'm understanding his decision correctly, what he said with respect to that argument was that the amount he was awarding was less than the amount that would be allowed if he did credit the payment. So he did address the credit. Correct, Your Honor. He addressed that. I was speaking of the payment from Michael Wigley. Should that be applied to the joint and several judgment and satisfy that completely? Meaning because Michael Wigley made the full claim payment and the two claims in Lariat under the Michael Wigley case were kind of . . . So if we had a Venn diagram, we'd have the $2.2 million judgment, and within that circle there would be the $1 million fraudulent conveyance claim. And your argument is that the payment from Mr. Wigley's bankruptcy estate should first be applied to that smaller circle. I believe there's a $3.2 million total. There was about a $2.2 million lease termination judgment and then the joint and several judgment from the fraudulent transaction. But that doesn't add to the $2.2 million. That's just a collection mechanism to reduce the $2.2. Isn't that correct? Correct, Your Honor. This court held that those are one and the same, so they only, I guess, without expressly overruling it, they considered both judgments to be the same amount under the lease termination. Okay. Getting back to the landlord cap, we believe the bankruptcy court correctly held that it is applicable. Under the statute, the court must look at the plain language. And as the Ninth Circuit said, a plain reading of the section, which is 502B6, underscores that if it is the claim of the lessor, which is Lariat, not the status of the lessee or its agent or guarantor that triggers the applicability of the cap. The section has two predicates, claim of the lessor and damages resulting from the termination of a lease of real property. So she didn't have any liability under the lease at the time the state court judgment was entered, correct? Correct, Your Honor. And by that, I mean the lease breach of $2.3 million. So the MUFTA was an effort then to enforce transfers to be applied to that state court judgment. So what's her liability under the lease that would then trigger the application of this 502B6? There is no liability under the lease. However, that doesn't matter because the reason we're here is because there was a default under a lease for which she is now being pursued. MUFTA doesn't create a separate cause of action. It relates to an underlying cause of action, which is the lease default that Mr. Wigley was sued for. So let's take this out of the context of bankruptcy. Pretend Mr. Wigley has never filed, Mrs. Wigley has never filed. If Mr. Wigley paid the $2.3 million, what happens to the MUFTA judgment then? In our opinion, the MUFTA judgment is satisfied in full because the underlying claim was paid in full. MUFTA is just a remedy to protect creditors, and it doesn't create a separate cause of action. And under MUFTA, the creditor may only be paid the amount of the claim or the amount of the transferred asset, whichever is less. So if Ms. Wigley was transferred a half a million dollars, she's not liable for the $2.3 million. She's liable only to the extent of the asset that was transferred to her. And I guess that dovetails into our cross-appeal, and I'd like to discuss why we feel that there is no claim here that Michael Wigley's payment under his Chapter 11 plan extinguished any liability on the part of Mrs. Wigley. 502B1 states that if such a claim is unenforceable against the debtor and property of the debtor under any agreement or applicable law for a reason other than because such claim is contingent or unmatured. The bankruptcy court rejected Appelli's argument that the claim was unenforceable because the underlying obligation was extinguished by Mike Wigley's payments to the appellant. You know, I want to stop you there because you made the comment that you think that the claim is zero. Then why did you stipulate that if the cap applies to her, it would be $308,000? I mean, I guess you entered into these stipulated numbers, whatever they might be. The amounts aren't important, but, you know, there is no option for it to be zero. So is that an argument we even should look at at this point since the parties seem to agree as to the amounts that are owed? Well, we made the argument the claim was zero, and the court ruled against that argument, and then it moved on to if the cap applies, what are the three different scenarios? So it never got to the issue that you propose here, which is 502B6 does apply, and therefore since he paid the claim, her liability is now zero. That's our cross appeal. Well, that's not quite the argument, though, is it? The argument is we don't get to 502B6 because there's no liability. There's nothing to cap because there's zero. That's correct, Your Honor. That's our argument. We feel that the claim against Mrs. Wigley is derivative from the claim in which Mr. Wigley was liable, and the distinction is under that fraudulent conveyance judgment, they were joint and several. When you say derivative of, do you mean the move to action or the lease action? The lease action. So you're admitting then that the move to action is derivative from the lease? Well, I'm saying that the purported claim against Mrs. Wigley in this case is not a separate claim. It's arising from or stemming from the underlying lease termination judgment in state court. So I don't know if derivative is the right word, but it's not a separate claim, as the appellant suggests. There was no claim that sprung into action when she accepted the assets. The claim relates back, and I can quote MUFTA, it relates back to the underlying action. Well, I think Judge Nail said if it was in a Venn diagram, it would be the smaller. I call it a subset. Whether you call it derivative, subset, smaller number, we think we understand. Okay. So the argument and the distinction here is we're not arguing that Mr. Wigley's discharge got Mrs. Wigley off the hook. We're not arguing that. We understand that the discharge has no effect to a non-bankruptcy party. What we are arguing is that the two claims Lariat had in the Michael Wigley case were squished together and essentially became one claim, and he paid the entire claim as ordered by the bankruptcy court in the BAP in full. And one of those claims was the joint and several judgment in which his wife was liable. So that payment in his bankruptcy fully satisfied the claim, and since she was joint and several, she received the benefit of that payment. So upon his confirmed plan and his subsequent payment, that claim in the underlying claim of MUFTA, which is part of that claim, was paid in full. That's the argument why we feel there is no claim here by Lariat. Are you saying that you never get to B-6 because of B-1? No, I'm saying the distinction is a joint and several liability under the fraudulent transfer judgment. If there was a guarantor, cousin Wigley, and there was no joint and several liability with cousin Wigley. I'm waiting for him to show up in the case, by the way. Something else is going to happen, I'm sure. Yeah, or if there are five guarantors, you know, if only one of the five had a fraudulent transfer MUFTA judgment, Lariat could pursue the other four and get four separate landlord caps against the other four guarantors. So the distinction here is that joint and several MUFTA judgment. That makes Lariat's claim zero in the Barbara Wigley case. Under the 502 B-6, we cited a case where a garnishee, a corporation that failed to garnish the judgment debtor's wages, was liable under a garnishment statute, and that corporation filed and was availed of the 502 B-6 cap. That case is the main case. So as an analogous fact pattern, the corporation that failed to garnish was liable under a separate state garnishment statute. It had nothing to do with the underlying judgment. It just failed to follow the collection statute. So it was thus deemed to be liable under the judgment. So when that corporation filed, they were entitled to the 502 B-6 cap as a garnishee. And I believe that's an analogous case here. They weren't on the underlying litigation. They just failed to do something post-entry of that judgment. Unless the Court has anything else, I'll reserve the rest of my time. Thank you. Thank you. I have my two-minute warning. I'm going to take up part of your time right off the bat so we can save some time for you maybe. I want you to answer Judge Chaudine's hypothetical that she put to opposing counsel. If we were outside of the bankruptcy context and we have a $2.2 million judgment for the lease termination and we have the million-dollar judgment for the MUFTA transfers, okay, if Mr. Wigley had paid the entire $2.2 million judgment, wouldn't that eliminate the MUFTA judgment? Correct, because its effect would, in effect, pay the debt of a co-debtor as well. Look, it's a collection device. It's not an independent liability. It's a collection device, and therefore, I mean, I understand it's an independent liability, but it's a collection device, and therefore, if you collect your $2.2, you can't also collect the million. Well, that's right. The fraudulent transfer gives rise to a co-debtor liability, not under a guarantee or a lease, but simply under fraudulent transfer law. And if you pay the whole liability, you're taking care of your co-debtor as well. I don't think that determines the issue here because we still have this question, does the liability of Mrs. Wigley result from? Well, but we don't get there if the underlying claim has been paid in full. I guess the question is, is a payment pursuant to a Chapter 11 plan of something less than the original amount owed because of 502B6's cap, is that payment in full? Well, it's not. I understand your position on that. You can take that $2.3 million and imagine it as a bar draft and slice off little segments as it gets paid, but ultimately it hasn't been fully paid. There's still plenty that Lariat has to walk away from here. I wanted to make a couple points by way of quick rebuttal. Number one is, of course, through the miracle of electronics, your court documents are in PDF format. You can search Mrs. Wigley's trial memos, and ours for that matter, before Judge Fisher, and you will see that the word accord or satisfaction does not appear. That phrase does not appear anywhere in those. If it was argued, I guess it would be up to Mr. Lamey to produce a transcript. He hasn't. As far as we can tell, this accord and satisfaction is an entirely new brainstorm on appeal. Second thing, the analogy between a garnishee and a fraudulent transferee doesn't work. An uncompleted garnishment, the money that should be held by a garnishee, immediately becomes property of the estate under Section 541 on a filing of a bankruptcy case. It can be recovered by a trustee under a turnover action, whereas a fraudulent transfer does not immediately become the property of the estate, and I think we cited a case law to this effect that it does not become property of the estate at all until the trustee actually takes action to avoid it, which never happened in Michael's case. But the transfer had already been avoided by the state court action, so actually wouldn't the estate succeed to the interest of your client in that transferred property? Well, that's a very interesting question that I think— And we don't have time for it. I'll give you a little bit of extra time, but we'll take that up on Wigley 6. I hope not. As the court recognized also, this court recognized, whereas a garnishment may be stayed, as this court recognized, a fraudulent transfer action is not stayed. I was saying time's up. Thank you very much. Thank you. By the way, I apologize for the cell phone. I swore I turned it off. Not a problem. I did not hear it, so that's fine. Thank you, Your Honors. My final point is Mrs. Wigley, as a transferee, was found liable under the provisions of MUFTA. Therefore, the fraudulent transfer judgment entitles Lariat to recover judgment for the value of the asset transferred as adjusted under paragraph C, or the amount necessary to satisfy the creditor's claim, whichever is less. So the question becomes, is the claim that's being satisfied the one against Mr. Wigley under 506, or is it the entire amount of the state court judgment that was entered that gave rise, or then was followed by the MUFTA action? That's the question for Your Honors to consider. I understand that, but can you explain to me which you believe applies? The bankruptcy court determined the allowed claim after much up and down litigation, so Mr. Wigley . . . The allowed claim in the bankruptcy, not the claim from state court, correct? Correct, but as the judgment detour, he filed bankruptcy and availed himself the federal law, which adjusted the state court judgment down to the amount allowed under 502B6. So his bankruptcy altered the state court judgment and determined that his claim was the 546,000 plus interest, and so the better part of $600,000 was paid, and that was in satisfaction of Lariat's claim as adjusted under the Chapter 11 bankruptcy that Michael Wigley filed. So under MUFTA, Lariat's been paid. The claim here should be zero. Thank you. Thank you. Thank you.